UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| KEVIN M. EAGEN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 25-300-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| CORE SPECIALTY INSURANCE | ) | **MEMORANDUM OPINION** |
| HOLDINGS, INC., et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendants Core Specialty Insurance Holdings, Inc.; Core Specialty Insurance Services, Inc. (collectively "Core"); William Vens, Joseph Consolino, and Don Larson have moved to dismiss Plaintiff Kevin Eagen's Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Record No. 5] After reviewing the parties' arguments, the undersigned is satisfied that Eagen states a claim for hostile work environment, retaliation, and intentional infliction of emotional distress.[1] He fails, however, to state a claim for disparate treatment/sex discrimination, wrongful employment practices, and negligent retention.

**I.**

Eagen has been the President of the Equine Division of Defendant Core Specialty Insurance Holdings, Inc., and its subsidiaries since 2021. [Record No. 1-2 at ¶ 9] He continues to serve in that role. *Id.* at ¶ 11. Both he and his department have consistently performed well

---

[1]    As noted below, the facts as outlined are taken in the light most favorable to the non-moving party and do not represent findings of the Court.

and exceeded company expectations. *Id.* Eagen's responsibilities in that role require him to travel frequently from the Equine Division's headquarters in Lexington, Kentucky, to Defendant Core Specialty Insurance Services, Inc.'s [2] headquarters in Cincinnati, Ohio, for required presentations and to meet with members of the Executive Committee. *Id.* at ¶ 1.

Eagen attended a meeting at Core's headquarters in Cincinnati on February 13, 2025. [Record No. 1-2 at ¶ 13] During that meeting, Defendant William Vens was reviewing Core's 2024 financial report. *Id.* at ¶ 14. However, Eagen disagreed with the report and identified discrepancies concerning his equine insurance division's performance. *Id.* Eagen's explanations and corrections contradicted information Vens reported and reflected poorly on the performance of Vens and his division. *Id.*

As Eagen walked past Vens' office following the meeting, Vens gestured for Eagen to come inside. [Record No. 1-2 at ¶ 15] Vens appeared enraged and visibly trembling. *Id.* His face was described as red as a beet. *Id.* In one hand, he was crushing a soda can and with the other, he was making a fist. *Id.* Growling through gritted teeth in a low, ominous voice, Vens demanded to know why Eagen had not first discussed the accounting discrepancy with him before raising it during the meeting. *Id.* at ¶ 16. Vens accused Eagen of attacking Vens' team in public and chastised him for having no idea what he was talking about concerning the financials that had been discussed. *Id.*

Vens leaned over his desk where he kept a baseball bat that he occasionally carried around the office to intimidate employees. [Record No. 1-2 at ¶ 17] He scanned the area to ensure no one could hear him and gestured at Eagen with his fist in the air. *Id.* at ¶ 18. "You

---

[2]     Core Specialty Insurance Holdings, Inc. is the parent company of Core Specialty Insurance Services, Inc. [Record No. 1-2 at ¶ 2]

should have been humiliated in that room!" he snarled.  *Id.*  "It's going to be very hard for me to like you any longer, especially when I'm reviewing your incurred results, five years, or any results going forward."  *Id.*

Eagen understood Vens' words to be a threat to harm Eagen professionally, personally, and financially.  [Record No. 1-2 at ¶ 19]  At the time,[3] Vens was the Executive Vice President and Chief Financial Officer of Core.  [Record No. 5-5 at 4]  And because Vens managed financial accounting, he had the ability to manipulate his analysis and report to reflect poorly on Eagen's department.  [Record No. 1-2 at ¶ 19]  Eagen interpreted Vens' actions to be, in part, due to him being a gay man, a fact well-known to Core personnel.  [Record Nos. 1-2 at ¶ 12 and 9 at 4]

Eagen reported Vens' conduct to Core's Deputy General Counsel and its Chief Operating Officer on his drive back to Lexington.  [*See* Record No. 1-2 at ¶ 20.] He reported the incident to Core's Vice President for Human Resources later that evening.  *Id.* at ¶ 20.  The following day, he emailed Core's Chief Executive Officer Defendant Joseph Consolino, notifying him of Vens' conduct.  *Id.* at ¶ 21.  Both Eagen and Vens reported directly to Consolino.  [Record No. 9 at 4]

Initially, it seemed as if Core would take action, but a couple of weeks after the incident, Consolino informed Eagen that no investigation, discipline, or dismissal would be imposed against Vens.  [Record No. 1-2 at ¶ 25]  General Counsel Robert Kuzloski explained to Eagen that Vens is an investor in the parent company and that Core did not want the incident to become public knowledge while it was in the process of an Initial Public Offering ("IPO").  *Id.*

---

[3]    For reasons unrelated to the February 2025 events, Vens left Core four months later.  [*See* Record No. 1-2 at ¶¶ 13, 34.]

Vens was also responsible for Core's Corporate Finance, Investment, and Mergers & Acquisitions. [Record No. 9 at 4]

Rather than reprimand Vens, Kuzloski and Vice Chair of the Board Defendant Don Larson requested that Eagen delay taking any further steps with his complaint until after the IPO. [Record No. 1-2 at ¶ 28] To manage the tense situation, Larson suggested that Eagen take a paid six-week sabbatical until the upcoming board meeting occurred, after which, everyone could "move on from there." *Id.* at ¶ 29. Despite no longer feeling safe traveling to the Cincinnati office where Vens worked, Eagen declined that suggestion because he worried that his absence would compromise his credibility with his team and in the market. [Record No. 9 at 8]

Following Eagen reporting Vens' behavior to Core personnel, Eagen and those within his department were excluded from meetings relating to their department. [Record No. 1-2 at ¶ 31] Consolino instructed his direct reports to "invite themselves" to offsite work events that Eagen would be attending and to monitor his work electronically. *Id.* at ¶ 29.

In addition to Vens' conduct, in 2022 Consolino purportedly stripped down to his underwear to change his clothes in front of Eagen in Eagen's office. [Record No. 1-2 at ¶ 46] Then, in January 2025, Consolino asked to try on Eagen's Blazer, noting that Eagen was "so lean." *Id.* at ¶ 41. In the same month of the incident involving Vens, Consolino squeezed Eagen's bicep and whispered in his hear that he "always looks so good." *Id.* at ¶ 45. Eagen alleges that his experiences are not isolated incidents and that Core has a history and reputation of ignoring complaints and exhibiting misogyny toward non-male employees. *Id.* ¶¶ 47–53.

Eagen's lawsuit was originally filed in Fayette Circuit Court but was removed to this Court based on diversity jurisdiction. [Record No. 1] He asserts claims for sexual harassment

and discrimination under the Kentucky Civil Rights Act, Ky. Rev. Stat. Ann. §§ 344.010 *et seq.*, ("KCRA") against Core and Vens (Count I); retaliation under the KCRA against Core, Consolino, and Larson (Count II); wrongful employment practices against all defendants (Count III); intentional infliction of emotional distress against Vens (Count IV); and negligent retention against Core (Count V).[4]  [Record Nos. 1-2 and 9 at 2–3]  Core moves to dismiss all Eagen's claims in his Complaint for failure to state a claim.  [Record No. 5]  But Eagen insists that his claims are adequately pled.  [Record No. 9]  Alternatively, he seeks leave to file an amended complaint, if the Court determines that any of his allegations are insufficient.  *Id.* at 14 n.4.

## II.

When evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (quoting *Twombly*, 550 U.S. at 556).  And while a complaint need not contain detailed factual allegations, a plaintiff must provide more than mere labels and conclusions, and "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555. Further, while plaintiffs are not required to plead facts showing that the defendant is likely to be responsible for the harm alleged, they must demonstrate "more than a sheer possibility that a

---

[4]     Eagen voluntarily dismisses Count V.  [Record No. 9 at 2]

defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. When reviewing a motion under Rule 12(b)(6), the court must "accept all of plaintiff's factual allegations as true and determine whether any set of facts consistent with the allegations would entitle the plaintiff to relief." *G.M. Eng'rs & Assoc., Inc. v. West Bloomfield Twp.*, 922 F.2d 328, 330 (6th Cir. 1990).

## III.

### KCRA Claims

Discrimination claims "at the motion-to-dismiss stage" do not require a plaintiff "to plead facts establishing a prima facie case as is required under *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)." *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 839 (6th Cir.), *cert. denied*, 144 S. Ct. 2689 (2024) (citing *Keys v. Humana, Inc.*, 684 F.3d 605, 608–09 (6th Cir. 2012)). However, as noted previously, a plaintiff's "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Therefore, looking to the elements of the requisite prima facie claim is useful in assessing the plausibility of the allegations raised in the complaint. *See Keys*, 684 F.3d at 609–10 (citing *Iqbal*, 556 U.S. at 678)).

Courts commonly use Title VII of the Civil Rights Act of 1964 ("Title VII") case law to interpret the KCRA due to the parallel language in the federal and state Acts. *Banks v. Bosch Rexroth Corp.*, 15 F.Supp. 3d 681, 688 (E.D. Ky. 2014), *aff'd*, 610 F. App'x 519 (6th Cir. 2015) (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007)); *see also Brooks v. Lexington-Fayette Urb. Cnty. Hous. Auth.*, 132 S.W.3d 790, 802 (Ky. 2004), *as modified on denial of reh'g* (May 20, 2004). Because the "provisions of the KCRA are virtually identical to those of the Federal [Civil Rights Act]," Kentucky courts "must consider the way the Federal act has been interpreted." *Jefferson Cnty. v. Zaring*, 91 S.W.3d 583, 586 (Ky. 2002) (citing

*Mills v. Gibson Greetings, Inc.*, 872 F.Supp. 366, 371 (E.D. Ky. 1994) and quoting *Harker v. Federal Land Bank of Louisville, Ky.*, 679 S.W.2d 226 (1984)).

At the outset, the parties agree that this matter only includes KCRA claims and not claims arising under Title VII.  [Record No. 9 at 14]  The Supreme Court in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), clarified that plaintiffs bringing discrimination claims under Title VII need not show "*significant*" harm but only "*some harm* respecting an identifiable term or condition of employment" to demonstrate an adverse employment action.  *Id.* at 355 (emphasis added).  Before *Muldrow*, courts within the Sixth Circuit applied the "materially adverse" standard that *Muldrow* overruled.  *See Patterson v. Kent State Univ.*, 155 F.4th 635, 645–46 (6th Cir. 2025).  That standard circumscribed adverse employment actions to those that resulted in "'a materially adverse change in the terms of employment.'"  *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 902 (6th Cir. 2024) (quoting *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004), *aff'd sub nom.*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

When interpreting adverse employment actions under the KCRA, Kentucky courts have applied the "materially adverse" standard.  Although courts commonly use Title VII case law when interpreting the KCRA, the undersigned is unable to Kentucky state court decisions that have applied *Muldrow*'s interpretation to KCRA claims.  Under such circumstances, federal courts sitting in diversity, and confronted with an undecided question of Kentucky law, must make the best prediction, even in the absence of direct state precedent, of what the Supreme Court of Kentucky would do if it were confronted with the question.  *McCarty v. Covol Fuels No. 2, LLC*, 978 F. Supp. 2d 799, 809 (W.D. Ky. 2013), *aff'd*, 644 F. App'x 372 (6th Cir. 2016) (citation modified).

- 7 -

It is arguable whether the following question is one of Kentucky law: should *Muldrow*'s Title VII interpretation be applied to KCRA claims? That said, Kentucky's Supreme Court *has* instructed that Kentucky courts "must consider the way the Federal act has been interpreted" when resolving KCRA claims. *Zaring*, 91 S.W.3d at 586. Thus, it is an undecided question of Kentucky law whether the directive to "consider" would include applying *Muldrow* to the KCRA.

The defendants contend that even assuming the *Muldrow* standard applies to the KCRA, Eagen cannot demonstrate an adverse employment action. [Record No. 13 at 2] Eagen never cites *Muldrow* and instead references an unpublished, post-*Muldrow* Kentucky Court of Appeals case that applies the "materially adverse" standard. [Record No. 9 at 17 n.5 (quoting *Fayette Cnty. Bd. of Educ. v. Mitchell*, No. 2023-CA-0743-MR, 2025 WL 1717110, at *12 (Ky. Ct. App. June 20, 2025) ("An adverse employment action has been defined as 'anything that adversely and materially affects an employee's status or conditions of employment.'")).]

Here, where neither the Kentucky Court of Appeals nor the Supreme Court of Kentucky has applied or adopted *Muldrow*'s interpretation concerning the KCRA, the Court is not inclined to take such liberty while sitting in diversity. Furthermore, the Kentucky Court of Appeals applying the materially adverse standard post-*Muldrow* suggests the Supreme Court of Kentucky would follow suit. Thus, based on the limited information before the Court, the undersigned concludes that the best prediction of what the Supreme Court of Kentucky would do is to continue to apply the materially adverse standard.

*Muldrow* also altered the standard for plaintiffs bringing hostile-work-environment claims under Title VII. Such plaintiffs still must show that their workplace is "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment.'" *See McNeal*, 117 F.4th at 897 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). But now, when assessing harm, "courts should ask whether a work culture permeated with discriminatory harassment 'left an employee "worse off respecting employment terms or conditions,"'" not whether an employee was *significantly* worse off." *Kellar v. Yunion, Inc.*, 157 F.4th 855, 870 (6th Cir. 2025) (emphasis in original) (quoting *McNeal*, 117 F.4th at 904 (quoting *Muldrow*, 601 U.S. at 355)).

Importantly, after *Muldrow* and *McNeal*, "plaintiffs are no longer required to show unreasonable interference with work performance to mount a claim." *Kellar*, 157 F.4th at 870 (citation modified). Stated differently, unreasonable interference is no longer an element of a prima facie case; rather, it is only considered during the totality of the circumstances test when determining if the harassment was severe or pervasive. But like *Muldrow*, the undersigned is unable to locate any Kentucky cases citing or applying *McNeal* or *Kellar* to the KCRA.

With that backdrop, the Court turns to the plaintiff's claims under the KCRA.

### Sex Discrimination/Disparate Treatment

The KCRA prohibits employers from discriminating "against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's . . . sex." KRS § 344.040(1)(a). Discrimination can be proven "with either direct or circumstantial evidence." *Patterson*, 155 F.4th at 644. Without direct evidence of sex discrimination, the plaintiff must: "(1) be in a protected class, (2) suffer an adverse employment action, (3) qualify for the responsibilities sought, and (4) be treated differently than someone similarly situated but not in his protected class." *Id.* at 645 (citing *McNeal*, 117 F.4th at 895).

A change to an employee's job "must be materially adverse to the employee" to constitute an adverse employment action in a discrimination claim. *Mitchell*, 2025 WL 1717110, at *12. More specifically, a "materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Brooks*, 132 S.W.3d at 802). Such changes may include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (quoting *Brooks*, 132 S.W.3d at 802). However, a "bruised ego" caused by trivial employment actions do not transform them into adverse employment actions. *Id.* at *16. (citation omitted).

Here, the defendants insist that Eagen's Complaint fails to include a disparate treatment claim, but even if it did, it fails because he does not identify an adverse employment action. [Record No. 13 at 3–4] More specifically, they argue that even under *Muldrow*, he must allege a "tangible change to the terms or conditions of employment, not just irritation or oversight." *Id.* at 1–2. And he has not suffered an adverse employment action because he remains employed by Core in the same role with no reduction to pay or benefits. *Id.* at 2.

Conversely, Eagen contends that he has properly pled his sexual discrimination claims against Core and Vens. [Record No. 9 at 2 (noting that Count I is alleged against Core and Vens).] He notes at the outset that Core does not contest that he was a member of a protected class or that he was qualified for his position. *Id.* at 16.

Concerning adverse employment actions, he references being excluded from meetings involving his department, his coworkers being told to monitor his work, and Core's refusal to investigate Vens and discipline him or otherwise ease Eagen's difficulties resulting from Vens'

actions. *Id.* And he asserts he experienced harassment based on his sexuality when Consolino changed his clothes in front of him, said he was "so lean," and "always looked so good." *Id.* While Eagen concedes that Vens' veiled threat that "[i]t's going to be very hard for me to like you any longer" did not specifically reference his sexuality, he insists that he understood the threat to be motivated (at least in part) by his sexuality. *Id.* He implies that he was treated differently by Consolino and Vens due to his being gay.

Eagen fails to allege any action that constituted a materially adverse change to the conditions of his employment.[5] To be sure, he identifies two actions that he believes suffice: (1) his exclusion from meetings involving his department, and (2) Core "failing to take steps to make Eagen's workplace safe and non-threatening." [Record No. 9 at 17 n.5] The Court is not convinced, however. Further, Eagen's exclusion from meetings and Core's failure to act concerning the environment is attributed to Core, not Vens. Thus, he does not state a claim for sex discrimination against Vens.

Regarding harm, Eagen's Complaint includes that he was excluded from meetings involving his department. [Record No. 1-2 at ¶ 31] But being excluded from meetings is no more disruptive than a "mere inconvenience or an alteration of job responsibilities." *Mitchell*, 2025 WL 1717110, at *12 (quoting *Brooks*, 132 S.W.3d at 802). Such an exclusion does not constitute "significantly diminished material responsibilities," nor are there other indices in

---

[5] Generally, increased monitoring does not implicate a "'harm respecting an identifiable term or condition of employment.'" *Shannon v. Flex N. Gate Detroit, LLC*, No. 23-12473, 2025 WL 1638514, at *12 n.16 (E.D. Mich. June 9, 2025) (quoting *Muldrow*, 601 U.S. at 354–55). While Eagen's other grievances may be applicable to other claims, they do not rise to the level of an adverse employment action for sex discrimination.

this instance that suggest a material change to Eagen's employment. *Id.* (quoting *Brooks*, 132 S.W.3d at 802). At most, he suffered a "bruised ego." *Id.* at *16.

So too for Core's "failing to take steps to make Eagen's workplace safe and non-threatening." Construing such an allegation as an adverse employment action would open the floodgates of lawsuits from disgruntled employees. The KCRA is designed to aid in making the workplace safe and free from discrimination, but a plaintiff must still allege his or her prima facie case. And while the KCRA is a powerful tool in the fight to eradicate the evils of employment discrimination, it is not intended to serve as a "'general civility code for the [Kentucky] workplace.'" *See Brown v. FCA US LLC*, No. 25-1405, 2025 WL 3657226, at *5 (6th Cir. Dec. 17, 2025) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

Again, Core's alleged failure is no more disruptive than a mere inconvenience. And it is a country mile from "'a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities.'" *Mitchell*, 2025 WL 1717110, at *12 (quoting *Brooks*, 132 S.W.3d at 802). Clearly, Eagen does not dispute that his salary, title, benefits, and material responsibilities remain the same.

But even if Eagen had pled an adverse employment action, his claim still fails because he provides no factual content that would allow a reasonable inference that Core denying access to meetings or failing to provide a safe environment free from discrimination were *because of* his sexual orientation. The KCRA forbids employers from discriminating against employees *based on* sex. KRS § 344.040(1)(a) (emphasis added). His own pleadings make clear that Core personnel were aware that he was gay during the time that he was included in meetings involving his department. It was only once he complained about Vens that he was

- 12 -

excluded from such meetings; and his Complaint states as much.  [Record No. 1-2 at ¶ 63]
Thus, he fails to provide "factual content" that would allow "the court to draw the reasonable
inference" that Core excluded him from meetings because of his sexual orientation.  *Iqbal*, 556
U.S. at 678 (internal quotations omitted) (citing *Twombly*, 550 U.S. at 556).  To avoid doubt,
Eagen's suggestion that Consolino exposing him to his undressing, squeezing his bicep and
commenting on his appearance does not prompt a reasonable inference that he was excluded
from meetings *because of* his sexual orientation.  [Record No. 9 at 16]

So too for Eagen's claim that Core failed to act to make his workplace safe and non-
threatening.  He provides nothing linking this failure to his sexual orientation.  To the contrary,
his Complaint makes clear that Core was "known to ignore or not take seriously complaints
about sexual harassment and hostile work environments."  [Record No. 1-2 at ¶ 53]

Eagen also fails to sufficiently plead that he was "treated differently than someone
similarly situated but not in his protected class."  *Patterson*, 155 F.4th at 645.  Eagen does not
allege or plead facts that would allow the Court to reasonably infer that non-gay employees
were treated differently respecting inclusion in meetings involving his or her department.
Undermining this element, he pleads that Core personnel met his domestic partner "as early as
April 2022," and between 2022 and February 2025, Eagen was included in meetings.  [Record
No. 1-2 at ¶ 12]  Thus, it is not reasonable to infer that he was treated differently from other
non-gay Core employees considering that Core was aware of his orientation for the three years
he was included in meetings.

Nor does he provide facts that would allow the reasonable inference that Core acted to
make non-gay employees' workplace safe and non-threatening.  Instead, his Complaint claims
that in 2024 Consolino did nothing after being notified that a security consultant considered

Vens' bat a weapon, further calling this element into question. [*See* Record No. 1-2 at ¶¶ 37–38.]

### Hostile Work Environment/Harassment

Similar to a sex discrimination claim, a hostile-work-environment claim requires a plaintiff to demonstrate that "(1) [he] is a member of a protected class, (2) [he] was subjected to unwelcome sexual harassment, (3) the harassment was based on [his] sex, (4) the harassment created a hostile work environment, and that (5) the employer is vicariously liable." *Gray v. Kenton Cnty.*, 467 S.W.3d 801, 805 (Ky. Ct. App. 2014) (citing *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005)). "Whether the harassment is severe and pervasive is determined by a totality of the circumstances test—circumstances including frequency and severity of the conduct, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

In this case, the defendants' assert that, at best, Eagen raises a single incident (concerning the events in Vens' office) that falls short of demonstrating harassment that was "severe or pervasive." [Record No. 5-1 at 9–12] And even if that one incident meets that threshold, Eagen has not shown that the harassment was connected to his protected status. *Id.* at 10. Finally, the defendants argue that Eagen fails to allege that the harassment had any bearing on his work performance. *Id.* at 12–13.

But Eagen insists that his hostile-work-environment claim against Core and Vens passes muster. [Record No. 9 at 2 (noting that Count I is alleged against Core and Vens).] The harassment he allegedly suffered includes: (1) Consolino changing his clothes in front of him, saying he was "so lean," and squeezing his bicep while whispering in his ear that he "always

looked so good"; (2) an environment permeated with "misogyny toward non-male employees" where women were demoted, demeaned, or replaced based on their sex; and (3) that same environment being one where men were treated favorably, despite being less qualified. *Id.* at 10–11.

While not sufficient to demonstrate an adverse employment action for a disparate treatment claim, taking the Complaint in the light most favorable to Eagen, his allegations that he was excluded from meetings involving his department and that Consolino told his coworkers to monitor his work and show up to events where he would be in attendance can be considered here under the totality of the circumstances test. [Record No. 9 at 16] Likewise for his claims that Core refused to investigate or discipline Vens or ease Eagen's difficulties resulting from Vens' actions. *Id.* So too for Core's generally lackadaisical approach to handling employee harassment and discrimination complaints.

Regarding Core's liability, Eagen does allege that it was aware of Vens' threatening words and actions yet did nothing. [Record No. 1-2 at ¶ 35] He also provides instances of a discriminatory environment and treatment towards women that went unaddressed by Core leadership. *See generally id.* at ¶¶ 36–54.

Eagen alleges more than the single incident in Vens' office, despite the defendants' arguments to the contrary. And when determining whether harassment is severe and pervasive, courts look to the totality of the circumstances. Here, Eagen claims that Consolino (his supervisor) made comments about his appearance, engaged in unwanted touching, and undressed in his presence. He further claims that Consolino instructed others to supervise Eagen's work and to show up at events where he was in attendance. He also describes Vens' conduct that is objectively demeaning and threatening. Concerning Core, he contends that it

- 15 -

harbors a general atmosphere of misogyny and fails to take harassment and discrimination claims seriously.  He further asserts that he was denied access to meetings involving his department.

Taken together, Eagen has sufficiently pled harassment that was severe and pervasive. This includes that the harassment unreasonably interfered with his work performance.  He alleges that, despite having work-related responsibilities at Core's headquarters, he no longer felt safe traveling to the Cincinnati office where Vens worked.  [Record No. 1-2 at ¶¶ 1, 29] This is sufficient for now.  Further, it is reasonable to infer that Consolino suggestive actions and comments were due to Eagen's protected status.  Concerning Vens, Eagen asserts that some women also were afraid of him.  *Id.* at ¶¶ 41–43.  At this juncture, it is a reasonable inference that Vens' threatening and demeaning actions toward Eagen were (at least in part) because of his sexual orientation.

### Retaliation

The KCRA "makes it unlawful for one or more persons '[t]o retaliate or discriminate in any manner against a person . . . because he has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding, or hearing under the chapter.'"  *Brooks*, 132 S.W.3d at 801 (emphasis omitted); *see also* KRS § 344.280(1).  To demonstrate a prima facie case of retaliation a plaintiff must show "(1) he engaged in activity protected by [the KCRA], (2) the defendant knew of his protected activity, (3) the defendant took materially adverse action against him, and (4) some causal link connected the protected activity and the materially adverse action."  *Patterson*, 155 F.4th at 647 n.8 (noting that even after *Muldrow*, the Court maintained that the adverse employment action be "materially

- 16 -

adverse" in the retaliation context) (citing *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019)).

The anti-retaliation provision "'protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" *Garner v. Cuyahoga Cnty. Juv. Ct.*, 554 F.3d 624, 639 (6th Cir. 2009) (quoting *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 67). A materially adverse employment action in this context is one that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 68. This standard is "'less onerous in the retaliation context than in the anti-discrimination context'" because it does not require that the action affect the terms, conditions, or status of employment. *See Beny v. Univ. of Michigan Bd. of Regents*, 740 F. Supp. 3d 621, 644 (E.D. Mich. 2024), *aff'd sub nom. Beny v. Univ. of Michigan*, No. 24-1674, 2025 WL 2124175 (6th Cir. July 29, 2025), *cert. denied*, 223 L. Ed. 2d 244 (Nov. 24, 2025) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

"[T]he appropriate standard to determine whether retaliation has occurred because a discrimination claim was made is whether the retaliatory conduct would have occurred 'but for' the employee engaging in protected complaints of discrimination[.]" *Asbury Univ. v. Powell*, 486 S.W.3d 246, 254 (Ky. 2016) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).

The defendants claim that Eagen's Complaint fails to identify any protected activity. [Record No. 5-1 at 15]  In fact, they note that the Complaint's stated reason (*i.e.,* to defend his department's performance and fears that Vens would retaliate) for Eagen notifying Core personnel of Vens' conduct belies his post-hoc justification (*i.e.*, that he believed Vens' actions

to be because of Eagen's sexuality). *Id.* They insist the Complaint's stated reasons do not "relate to any unlawful practice under the KCRA." *Id.* And even if Eagen had engaged in a protected activity, he failed to plead that he suffered a materially adverse employment action. *Id.* at 16.

Eagen brings retaliation claims against Larson, Consolino, and Core. He claims that, because he believed Vens' actions to be related to his protected status, he engaged in a protected activity when he made his complaint to Core personnel. [Record No. 9 at 19] Although he does not explicitly plead that he informed Core that Vens' actions were discrimination or because of his protected status, he contends that his actual words "will likely be fleshed out in discovery." *Id.* at 20.

The alleged materially adverse actions taken by the defendants include: (1) Larson suggesting that Eagen take a paid six-week sabbatical to ease the tense situation; (2) Consolino directing his reports to supervise Eagen's work and to attend after work events with him; and (3) Core personnel excluding Eagen from meetings involving his department, failing to investigate or discipline Vens, and offering "gratitude and best wishes" to Vens when he left the company to pursue other opportunities. [Record No. 1-2 at ¶¶ 29, 31–32, 34–35] He claims causation is clear because these activities occurred after his protected activity. [Record No. 9 at 20]

As an initial matter, the defendants cite the wrong standard for a materially adverse employment action for a retaliation claim. [Record Nos. 5-1 at 16 (noting that the action must change the terms or conditions of employment) and 13 at 12 (arguing that showing a materially adverse action is more difficult in a retaliation claim than it is in a discrimination claim).] As mentioned previously, a materially adverse employment action for a retaliation claim is one

that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Garner*, 554 F.3d at 639.  Again, this standard is "less onerous . . . than in the anti-discrimination context" because a plaintiff need not show that the action affected the terms, conditions, or status of employment.  *See Beny*, 740 F. Supp. 3d at 644.

The defendants do not appear to contest that, assuming Eagen's complaints were protected activity, the defendants *knew* of his protected activity.  Nor do they meaningfully challenge that there was a causal link between the protected activity and the materially adverse action.  [*See* Record No. 5-1 at 17 (summarily dismissing causation because the plaintiff cannot show protected activity or material harm).]  Nonetheless, Eagen must have engaged in a protected activity to trigger a retaliation claim.

Although his Complaint does not explicitly state that he notified Core personnel that he believed Vens actions were discrimination, it does include several references to his sexuality, which was widely known at Core.  It further includes references to Core personnel's knowledge of Vens' similar behaviors towards women.  Finally, Eagen substantially followed the procedures set forth in the Anti-Discrimination Policy and Complaint Procedure for reporting an act of discrimination.  The Policy requires that he "promptly report any harassment, bullying, discrimination or retaliation" and his Complaint provides that he called to report the incident on his way back to Lexington.  [*See* Record Nos. 1-2 at ¶ 20 and 9-2 at 7]  Under the Policy, the report was to be submitted to a "supervisor, manager, or a member of Human Resources" and Eagen conveyed the matter to Core's Deputy General Counsel, Chief Operating Officer, Vice President for Human Resources, and Chief Executive Officer.  [*See* Record Nos. 1-2 at ¶¶ 20–21 and 9-2 at 7.]  Thus, it is a reasonable inference that he reported to at least one of those individuals that Vens' actions were because of his protected

- 19 -

status.  Or alternatively, it was understood that he was making a formal complaint of discrimination based on the procedure he followed.  That he also reported his fears that Vens may harm him personally or professionally does not change this result.

Regarding a materially adverse action, Eagen alleges that after reporting Vens' conduct to Core personnel, he was denied access to meetings involving his department.  He further asserts that Consolino subjected him to increased supervision both during and after work hours.  These consequences, taken as true, could discourage a reasonable worker from making a discrimination complaint.  Thus, at this stage, they are sufficient to show a materially adverse employment action.

Less convincing is Eagen's claim that Larson suggested that he take off six weeks from work.  Such a response by company personnel after an employee makes a discrimination complaint would be unlikely to discourage a reasonable employee from making a complaint. If anything, rumors of Eagen being offered a paid six-week sabbatical would encourage others to complain.  Eagen argues that taking leave would have compromised his credibility in his department and the market.  Taking *that* allegation as true and construing the Complaint in his favor, he adequately pleads a materially adverse action with respect to Larson's suggestion.

## Kentucky Law Claims

### Wrongful Employment Practices

"Contract interpretation . . . is a question of law for the courts[.]"  *Butt v. Indep. Club Venture, Ltd.*, 453 S.W.3d 189, 192 (Ky. Ct. App. 2014) (citing *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992)).  Under certain circumstances, a written personnel policy may "confer contractual rights on its employees."  *Cummins v. City of Augusta*, No. 2012-CA-001641-MR, 2013 WL 5436657, at *2 (Ky. Ct. App. Sept. 27, 2013)

(citing *Parts Depot, Inc. v. Beiswenger*, 170 S.W.3d 354, 362 (Ky. 2005)).  However, when the written policy "contains a specific provision refuting the creation of an employment contract, it does not confer contractual rights.  *Id.*; *see also Jackson v. JB Hunt Transport, Inc.*, 384 S.W.3d 177, 184 (Ky. Ct. App. 2012) (finding a "specific disclaimer" in an employment agreement defeated the employee's "argument that a[n employment] contract existed"); *Furtula v. Univ. of Kentucky*, 438 S.W.3d 303, 309 (Ky. 2014), *as modified* (June 23, 2014) ("[W]hen the recipient of a statement is informed that the maker of the statement does not intend to enter into a contract, . . . the formation of a contract will not be implied.").

Where a contract refers to other writings, they are to be read in tandem to ascertain the parties' true contract.  *Univ. of Kentucky v. Regard*, 670 S.W.3d 903, 912 (Ky. 2023) (citing *Sackett v. Maggard*, 142 Ky. 500, 134 S.W. 888, 890 (Ky. 1911))  When one writing refers to the other and incorporates the "latter's contents into the contractual bargain; this is known as incorporation by reference."  *Id.* (citing *Dixon v. Daymar Colleges Group, LLC*, 483 S.W.3d 332, 344 (Ky. 2015)).  "'For a contract validly to incorporate other terms, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'"  *Id.* (citation modified) (quoting *Dixon*, 483 S.W.3d at 344).

Eagen concedes that his claim for wrongful employment practices regarding the Employee Handbook fails due to its express disclaimer: "This document is for informational purposes only and is not to be construed as an employment agreement or contract."  [Record No. 9 at 21]  But he insists that his claim for breach of contract on the Anti-Harassment Policy and Complaint Procedure persists because it contains no such disclaimer.  *Id.*  While Eagen concedes that the Employee Handbook (which includes the disclaimer) explicitly references the Anti-Harassment Policy and Complaint Procedure, he insists that it is a "distinct document,

- 21 -

not incorporated into or attached to the Handbook." *Id.* Therefore, he does not believe the disclaimer has any bearing on his contract claim for Core's alleged violation of the Policy and Complaint Procedure. *Id.*

The defendants disagree. They argue that neither the Employee Handbook nor the Anti-Harassment Policy and Complaint Procedure are contracts. Either way, Kentucky law is clear that when a document is incorporated in a contract *via* explicit reference, then the disclaimer also applies to the incorporated document. [Record No. 13 at 13] Regardless, Eagen does not allege "how Core breached the Policy or misapplied its Complaint Procedure, which grants the Company discretion to decide whether a violation occurred." *Id.* Nor could he make that showing as Core's Policy and Complaint Procedure allows personnel to "determine 'appropriate disciplinary action,' which does not mean that it must initiate specific discipline as requested by the complaining employee. *Id.*

Here, the "Harassment" section of the Employee Handbook includes "[y]ou are required to review and follow the Company Anti-Harassment Policy, which may be found on the CORESpace intranet." [Record No. 9-1 at 41] In the "Complaints" section, it again directs the employee to refer to the Anti-Harassment Policy and states "[n]ot every problem can be resolved to everyone's total satisfaction." *Id.* at 46. The bottom of those pages (and every page in the Handbook) contains the following: "[t]his document is for informational purposes only and is not to be construed as an employment agreement or contract. Core Specialty retains the right to amend or change policies contained herein at any time without prior notice." *Id.*

Even assuming the parties had a contract, the "you are required to review and follow the Company Anti-Harassment Policy" language in the Employee Handbook makes clear that Eagen had "'knowledge of and assented to the incorporated terms'" in the Policy. *Dixon*, 483

- 22 -

S.W.3d at 344 (quoting 11 WILLISTON ON CONTRACTS § 30.25 (4th ed. 2014) ("For a contract validly to incorporate other terms, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'")).

Had the Anti-Harassment Policy and Complaint Procedure not been incorporated by reference, valid contracts must include "an offer and unequivocal acceptance, a certain and complete recitation of the material terms, and consideration. . . . [T]he terms of the contract must be sufficiently definite to enable the court to determine the measure of damages in the event of breach." *Regard*, 670 S.W.3d at 912. The portions that Eagen suggests Core breached include that Core will investigate claims of harassment and retaliation and take appropriate disciplinary action on any complaints. [*See* Record No. 9 at 12–13.] But these "terms" are nothing like those in *Parts Depot, Inc. v. Beiswenger* which included "one rate of compensation for 'on call' employees and another for 'subject to call' employees" where the Supreme Court of Kentucky found a contract. 170 S.W.3d 354, 356–57, 364 (Ky. 2005) (reviewing a company policy that did not include a disclaimer). Thus, it is a strain to construe the Policy as an express contract.

Neither do Core's documents create an implied contract. "Such clear and unequivocal disclaimers of contractual intent along with express reservations of the authority to alter and amend the disability policies *at any time* make it obvious to employees and prospective employees that [Core] did not intend, through these documents, to form a contract binding itself" to those documents. *Furtula*, 438 S.W.3d at 309–10 (emphasis in original) (finding no implied contract). The Anti-Harassment Policy's incorporation by reference in the Employee Handbook aside, the Policy lacks sufficiently definite terms for it to be a contract, as discussed above. Thus, even construing the Anti-Harassment Policy and Complaint Procedure in the

light most favorable to Eagen, there is no "complete recitation of the material terms," nor are those terms "sufficiently definite to enable the court to determine the measure of damages in the event of breach," foreclosing his contract claim. *Regard*, 670 S.W.3d at 912.

### Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress, the plaintiff must demonstrate: (1) the wrongdoers conduct was intentional or reckless; (2) the conduct was "outrageous and intolerable in that it offends against the generally accepted standards of decency and morality"; (3) there was a "causal connection between the wrongdoer's conduct and the emotional distress; and (4) the distress suffered was severe. *Morgan v. Bird*, 289 S.W.3d 222, 228 (Ky. Ct. App. 2009) (citing *Craft v. Rice*, 671 S.W.2d 247 (Ky. 1984) and *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996)).

The defendants argue that this claim as alleged against Core is subsumed by Eagen's KCRA claim against it based on Vens' actions. [Record No. 5-1 at 18 (citing *Bogle v. Luvata Franklin, Inc.*, 2013 WL 1310753, at *2 (W.D. Ky. 2013)).] But even if it were not, Core maintains that Eagen's "Complaint fails to allege sufficiently outrageous conduct or that he suffered severe emotional distress." *Id.* at 19. It cites cases in which Kentucky courts did not find the complained conduct sufficiently outrageous. *See id.* at 20. It further claims that Eagen has failed to plausibly allege severe emotional distress that is "'substantially more than mere sorrow.'" *Id.* (quoting *Benningfield v. Pettit Env't, Inc.*, 183 S.W.3d 567, 572 (Ky. Ct. App. 2005)).

Eagen appears to concede that his claim against Core is subsumed by his KCRA claim against Core. [Record No. 9 at 21] He insists, however, that his claim against Vens is not. *Id.* (citing *Wilson v. Lowe's Home Center*, 75 S.W.3d 229, 239 (Ky. Ct. App. 2001)). Following

a recitation of Vens' behavior following the meeting, he contends that those actions were sufficiently offensive and "'against the generally accepted standards of decency and morality.'" *Id.* at 22 (quoting *Morgan*, 289 S.W.3d at 228). Further, he claims his resulting distress was "'substantially more than mere sorrow,'" as alleged. *Id.* (quoting *Benningfield*, 183 S.W.3d at 572).

Construed in his favor and taken as true, Eagen's Complaint sufficiently pleads this claim against Vens but not Core. Having a coworker scold and threaten you while crushing a soda can and leaned over a baseball bat could be sufficiently offensive and "'against the generally accepted standards of decency and morality.'" *Morgan*, 289 S.W.3d at 228. Vens also demonstrated his ability to carry out his threats. Because of his role as the Chief Financial Officer, he could manipulate numbers relating to Eagen's department. And his bat was within his reach and kept in his office. Context matters. Here, this is a coworker's behavior, which by virtue of his employment, Eagen could not escape without leaving his job. Neither case the defendants cite where a court found behavior to not be sufficiently offensive involve the workplace. "[G]enerally accepted standards of decency and morality" are inherently context specific. *Id.*

Concerning emotional distress, Eagen claims it "has been and continues to be severe enough to affect [him] mentally and physically, requiring that he seek therapy and medication as a result." [Record No. 9 at 22 (citing Record No 1-2 at ¶ 70).] He also pled that he had a physical reaction "to the fear Vens instilled in him" and that he could no longer "work in the same location as Vens because of Vens's threatening, intimidating and harassing behavior." *Id.* (citing Record No 1-2 at ¶¶ 17, 23). These allegations are sufficient to allege that Eagen experienced "substantially more than mere sorrow." *Benningfield*, 183 S.W.3d at 572.

- 25 -

# IV.

If the Court were to find Eagen's pleadings insufficient, he requests leave to file an amended complaint under Rule 15(a)(2) of the Federal Rules of Civil Procedure. [Record No. 9 at 14 n.4] The defendants oppose this relief. [Record No. 13 at 3] They argue that Eagen's response "offers no reason to believe he can amend [his Complaint] to state viable claims." *Id.*

Rule 15(a)(2) provides that after the filing of a dispositive motion, "a party may amend its pleading only with the opposing party's written consent or the court's leave." The rule instructs that the "court should freely give leave when justice so requires." And courts liberally construe the rule because doing so reinforces "the principle that cases should be tried on their merits rather than the technicalities of pleadings." *Teft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982) (citations omitted); *Oleson v. United States*, 27 F. App'x 566, 569 (6th Cir. 2001). Therefore, leave to file an amended complaint should be granted "unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 519 (6th Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). That said, "plaintiffs are responsible for pleading their cause of action and are not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies." *Strayhorn v. Wyeth Pharms., Inc.*, 737 F.3d 378, 400 (6th Cir. 2013) (citation modified) (citing *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 573 (6th Cir. 2008)).

Under the facts presented here, leave to amend the Complaint will be denied because such amendment would be futile. More specifically, Eagen cannot show a materially adverse employment action respecting an identifiable term or condition of his employment because he

- 26 -

does not dispute that he remains employed by Core with the same pay, benefits, and material responsibilities. Nor can he amend to state a claim for wrongful employment practices against all defendants. As a matter of law and contract interpretation, the Anti-Discrimination Policy and Complaint Procedures do not create an express or implied contract under Kentucky law.

Further, Eagen failed to provide an amended complaint for the Court's consideration. *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) (citing *Shillman v. United States*, 221 F.3d 1336, 2000 WL 923761, at *6 (6th Cir. 2000) ("Normally a party seeking an amendment should attach a copy of the amended complaint."). And while courts are to "freely give leave" to amend, "that liberal policy does not apply to the plaintiff['s] one-sentence request. A 'request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant[s'] motion to dismiss is . . . not a motion to amend.'" *Id.* (quoting *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010)).

Based on the foregoing discussion and analysis, it is hereby **ORDERED** as follows:

1. Defendants Core Specialty Insurance Holdings, Inc.; Core Specialty Insurance Services, Inc.; William Vens, Joseph Consolino, and Don Larson's motion to dismiss [Record No. 5] is **GRANTED** with respect to Plaintiff Kevin Eagen's claims of sexual discrimination/disparate treatment against Core and Vens (Count I); wrongful employment practices regarding the Anti-Harassment Policy and Complaint Procedure against all defendants (Count III); and intentional infliction of emotional distress against Core (Count IV). However, the motion is **DENIED** with respect to Eagen's claims of sexual harassment/hostile work environment against Core and Vens (Count I); retaliation against

Core, Consolino, and Larson (Count II); and intentional infliction of emotional distress against Vens (Count IV).

2.      Plaintiff Eagen's negligent retention claim against Core (Count V) and wrongful employment practices claim regarding the Employee Handbook (Count III) are **DISMISSED** by Eagen's consent.

3.      Plaintiff Eagen's construed motion to amend his Complaint [Record No. 9] is **DENIED**.

4.      The **STAY** of discovery [Record No. 15] is **LIFTED**.    The parties are **DIRECTED** to meet and confer in accordance with the prior Order for Meeting and Report [Record No. 3].

Dated:  March 2, 2026.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky