**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | |
|---|---|
| **KEVIN M. EAGEN II**<br><br>    **Plaintiff,**<br><br>**V.**<br><br>**CORE SPECIALTY INSURANCE HOLDINGS, INC., et al.**<br><br>    **Defendants.** | **Civil Action No. 5:25-cv-300-DCR**<br><br>**Judge Danny C. Reeves**<br><br>**PLAINTIFF'S VERIFIED FIRST AMENDED COMPLAINT** |

The Plaintiff, Kevin M. Eagen II ("Eagen"), through counsel and pursuant to the Virtual Order entered April 25, 2026 [D.E. 21] granting the Parties' Proposed Agreed Order for Plaintiff to File First Amended Complaint [D.E. 20], for his Verified First Amended Complaint ("FAC") against Defendants, Core Specialty Insurance Holdings, Inc. ("Core Holdings"), Core Specialty Insurance Services, Inc. ("Core Services"), William Vens ("Vens"), Joseph E. "Jeff" Consolino ("Consolino"), and Don Larson ("Larson"), for Sexual Harassment/Hostile Work Environment, Retaliation, Intentional Infliction of Emotional Distress, and Discriminatory Termination, respectfully states as follows:

## THE PARTIES

1.    The Plaintiff, Kevin M. Eagen II, is an adult individual residing in Lexington, Kentucky. Until February 25, 2026, Eagen was the President of the Equine Division of Core Specialty Insurance Holdings and its subsidiaries. His employment was summarily terminated on February 25, 2026. Eagen worked primarily in the Lexington office of Core Specialty located at 100 W. Main St., Suite 250, Lexington, Kentucky 40507, where he was in charge of the Equine Division. Eagen also performed his job duties at other locations, including required presentations

and regular interactions with the Executive Committee at the corporate headquarters of Core Holdings in Cincinnati, Ohio.

2. The Defendant Core Specialty Insurance Holdings, Inc. is a company incorporated in Delaware with its principal office located at 201 E. Fifth Street, Suite 1200, Cincinnati, Ohio 45202. On information and belief, Core Holdings is the parent company of or otherwise affiliated with Core Specialty Insurance Services, Inc.

3. The Defendant Core Specialty Insurance Services, Inc. is a company incorporated in New Jersey with its principal office located at 201 E. Fifth Street, Suite 1200, Cincinnati, Ohio 45202. On information and belief, Core Services is a subsidiary of or otherwise affiliated with Core Specialty Insurance Holdings, Inc. Core Holdings and Core Services are hereafter referred to collectively as "Core."

4. The Defendant William Vens is an adult individual who resides in Cincinnati, Ohio and was until June 13, 2025 employed by Core Specialty Insurance Services, Inc. and Core Specialty Insurance Holdings, Inc. Vens was the EVP and CFO of Core Specialty Insurance Holdings, Inc.

5. The Defendant Jeff Consolino is an adult individual who resides in Cincinnati, Ohio and is employed by Core Specialty Insurance Services, Inc. and Core Specialty Insurance Holdings, Inc. On information and belief, Consolino is Core's Founder, President, and CEO.

6. The Defendant Don Larson is an adult individual who resides in Cincinnati, Ohio and is employed by Core Specialty Insurance Services, Inc. and Core Specialty Insurance Holdings, Inc. On information and belief, Larson is the Vice Chairman of Core's Board of Directors.

2

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 in that the amount in controversy is in excess of $75,000 exclusive of interest and costs and the matter and action is between citizens of different states.  This Court also has subject matter jurisdiction over this action in that it alleges violations of Federal Law, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq. and the Civil Rights Act of 1991, 42 U.S.C. §1981a, et seq.

8.      Venue in this Court is proper pursuant to 28 U.S.C. §1391(b) because a portion of the events and omissions giving rise to this action occurred in this District, the Defendant Core does business in this District, the Plaintiff resides in this District, and Eagen has suffered damages as a result of the conduct of Defendants in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### I.      Exhaustion Of Administrative Remedies Through The EEOC

9.      Eagen has exhausted his administrative remedies as required by 29 C.F.R. §1601.13 in order to file claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq. and the Civil Rights Act of 1991, 42 U.S.C. §1981a, et seq.

10.     On March 3, 2026, counsel for Eagen sent a letter to the EEOC's Louisville Area Office officially asserting claims of sexual discrimination and retaliation against Core.  In an abundance of caution, Eagen also completed the EEOC's intake questionnaire.

11.     On March 6, 20226, the EEOC issued a right to sue letter, a copy of which is attached as **Exhibit A**.  Eagen brings this FAC within the required 90 days of receipt of that letter.

### II.     Eagen's History At Core

12.     In March of 2021, Eagen presented Jeff Consolino and Don Larson the opportunity for Core Specialty Holdings (Parent), then Starstone US Intermediaries Inc, to enter into the

3

Equine Mortality and Equine Farm Property Insurance line of business. He was hired as President to launch the Equine Division in August of 2021.

13. Eagen's most recent position at Core was serving as its Equine Division President. His duties and responsibilities at Core at the time of his termination included leadership of the equine division's business operations, P/L, underwriting and claims handing teams, succession planning and talent assessment, annual financial planning, pricing, reinsurance, marketing.

14. Eagen was qualified to perform the functions for which he was employed at Core, and in fact always received perfect or near perfect reviews. His department consistently performed well, exceeding expectations in three of the four recent years.

15. Core personnel had long been aware that Eagen is gay. Jeff Consolino, Don Larson, Cathryn Warner, Susanne Fiederowicz, and William Vens all met Eagen's partner, Adam Wheeler, at corporate functions as early as April 2022. Adam Wheeler was also listed as Eagen's "domestic partner" for purposes of benefits provided by Core.

16. Eagen filed his original Complaint initiating this matter on July 28, 2025 in the Fayette County, Kentucky Circuit Court, Case No. 25-CI-3135.

17. Defendants removed this matter to this Court on August 27, 2025, and on August 29, 2025, Defendants filed a Motion to Dismiss all of Eagen's claims. By Order entered October 17, 2025, Discovery and the obligations set forth in the Court's Order for Meeting and Report were stayed pending resolution of the Motion to Dismiss.

18. The Court entered its Memorandum Opinion and Order on March 3, 2026, granting in part and denying in part the Motion to Dismiss and lifting the stay of discovery.

**III. Core's Direct Harassment Of Eagen.**

19. Eagen was angrily confronted, intimated, and threatened by Vens following a meeting which took place in Core Specialty's corporate headquarters in Cincinnati on February

4

13, 2025. Vens was then the Executive Vice President and Chief Financial Officer of Core, as well as a member of its Executive Committee, in addition to holding other positions in related entities and reported directly to Jeff Consolino, CEO.

20.    Eagen had brought out discrepancies in the 2024 Y/E financial reporting concerning his equine insurance division' performance at the meeting. Eagen's comments contradicted and reflected poorly on the work of Vens and his department.

21.    Immediately after leaving the meeting, Eagen passed the office of Vens. Vens then gestured to Eagen and told him to come into Vens's office. Vens was noticeably enraged. His face was red and one hand, trembling, was crushing a soda can. His other hand, after setting down his cell phone, was clenched in a fist.

22.    Through gritted teeth and in a low voice, Vens questioned Eagen as to why he had not first discussed the reporting issue in private and accused Eagen of attacking Ven's team in public. Vens then accused Eagen of not knowing what he was talking about as to the company financials.

23.    Vens leaned on his desk, on which was a baseball bat. Vens on occasion would walk through the Core Cincinnati offices carrying the bat, intimidating Core employees. On the occasion of the aforementioned meeting in Vens's office, Eagen felt threatened by Vens and physically reacted to the fear Vens instilled in him.

24.    Vens gestured at Eagen with his fist, looking around to make sure no one else could hear him. Vens said that others in the meeting liked Eagen and so Vens had not confronted him in the meeting, but, "[y]ou should have been humiliated in that room!" Vens then said to Eagen, "It's going to be very hard for me to like you any longer, especially when I'm reviewing your incurred results, five years, or any results going forward."

5

25.     Eagen interpreted Vens's remarks and demeanor to mean that Vens would harm Eagen professionally, personally, and financially. Vens's position and authority permitted him to harm Eagen by altering or framing his analysis of Eagen's department to artificially reflect poorly on Eagen and his department.

## IV.     Eagen's Complaints Regarding Vens

26.     Eagen, afraid and threatened, immediately left Vens's office and the building, and drove toward Lexington. On the way, he stopped and called Core's Deputy General Counsel and then Core's Chief Operating Officer and reported the altercation with Vens. Later that evening, Eagen spoke by phone with Corinne Costel, Vice President for Human Resources at Core. Eagen reported to all of them what had happened with Vens, and they all indicated to Eagen that they understood the seriousness of the situation. At least two female officers of Core have disclosed to Eagen that they have had similar intimidating encounters and fear Vens.

27.     The next day, February 14, 2025, Eagen wrote an email to Consolino, to complain about the treatment he received from Vens and to avoid a formal whistleblower complaint out of respect for Consolino, Larson and the company. Eagen again defended the performance of his department and stated that he felt Vens would retaliate against Eagen's department in future accounting evaluations.

28.     In his discussions with the head of human resources, Core's EVP and General Counsel Robert Kuzloski, Chief Operating Officer Cathryn Warner and Consolino, Eagen made it clear that he was not able to work with someone who threatened and intimidated him, especially considering the power of Vens to manipulate financial and accounting records and reports in an inappropriate manner that would inure to the detriment of the revenue of Eagen's department and the compensation of Eagen and his department's other members.

29.     Eagen felt, and reported to Core, that he could not work in the same location as Vens because of Vens's threatening, intimidating and harassing behavior. Eagen's job duties were substantially impacted by Vens's wrongful conduct. Eagen also felt, and reported to Core, that it would be inappropriate for Vens to have any influence, let alone control, over the reporting of the financial affairs of Eagen's department or the compensation of personnel in that department.

30.     Consolino and Kuzloski, with whom Eagen spoke about the Vens altercation, both initially stated they took Eagen's complaint very seriously and that it would be investigated and would lead to appropriate disciplinary action, up to and including dismissal, which appeared to be warranted. Kuzloski even jokingly made reference to the fact that "Vens does have a baseball bat."

31.     Despite those assurances, Consolino later told Eagen on February 27, 2025 that no disciplinary action and/or dismissal would be taken against Vens and no investigation was done. Kuzloski explained during a conversation with Eagen that Vens is an investor in the parent company and Core did not want the incident to become public knowledge while Core is in the process of an Initial Public Offering ("IPO"). An audit by Ernst & Young ("EY") is ongoing with a compliance opinion coming due and a plan to file a registration with the SEC, all with an eye toward an IPO. Removing the CFO could lead to a non-compliant opinion from EY, derailing the IPO. The reporting that an officer of Core was accused of sexual harassment, hostile work environment, and other wrongdoing may be material to the public offering and may adversely affect the value of the company and its stock.

32.     As a consequence of the imminent public offering, the EY Audit, the need to obtain a compliant audit opinion from EY, and Core's desire to conceal material information from investors and regulators, Core did nothing to remedy Ven's actions. For four months after Eagen's complaints, Vens was not removed from his position, publicly reprimanded, terminated, or even removed from any position of authority with regard to Eagen's department.

7

33.    Core knew of the sexual harassment and intimidation of Eagen by Vens and knew or should have known of Vens's sexual harassment and intimidation of women in Core, but failed to implement prompt and appropriate corrective action. Core's response manifested indifference or unreasonableness in light of the fact Core knew or should have known of Vens's conduct toward Eagen and others.

## V.    Core's Retaliation Against Eagen

34.    Instead of taking effective remedial measures, Kuzloski and Larson requested that Eagen delay taking any further steps regarding Vens until after the initial public offering occurs. Core took no actions to preclude future inappropriate conduct by Vens.

35.    Instead of reprimanding Vens, Larson suggested that Eagen take a paid six week sabbatical until after the upcoming May 28, 2025 Board meeting, "then we all move on from there." Even though Eagen rebutted the suggestion that he take a leave from work, he was not able to work in the same Cincinnati office of Core where Vens works, because of the fear and intimidation Vens instilled in Eagen.

36.    Kuzloski and Larson gave Eagen their word that an amicable separation agreement between him and the company would be discussed at the May 28 Board meeting and with the Compensation Committee, but nothing ever came of those assurances (likely because the EY Compliance Audit Opinion was delayed). In private, however, Larson referred to Consolino as "weird" and admitted that the Executive Committee of the company was "inept" and "all on probation."

37.    In subsequent days, Core personnel, including Consolino, held meetings relating to the Equine department headed by Eagen, but without asking Eagen or any other member of the department to attend or have any input.

38. Consolino instructed his direct reports to "invite themselves" to offsite work events Eagen would be attending and monitor his work electronically. One officer of the company told Eagen via text in March 2025 "you're on Jeff's (Consolino) mind, if you can't tell."

39. As a direct and proximate result of having complained to Core executives about the conduct of Vens, Core ostracized and minimalized Eagen, thereby undercutting his authority and reputation in the company, the end result of which was to substantially interfere with the employment of Eagen by Core and, ultimately, his termination by Core.

40. Finally in June 2025, Core announced internally that Vens had "left the company to pursue opportunities outside of the company." Core extended to Vens its "gratitude and best wishes." When Core finally announced to the general public in July that Vens was no longer with Core, it lavished him with praise.

41. Core did not terminate Vens for cause, or terminate Vens as a consequence of Vens's actions toward Eagen. On information and belief, Core never even thoroughly investigated Eagen's claims against Vens. Core did not punish or reprimand Vens, and instead punished and ostracized Eagen for bringing Vens's conduct to light. Even after Vens's departure, Consolino continued to speak well of Vens to others in the Company.

## VI.    Core's Hostile Work Environment

42. In addition to harassing Eagen and retaliating against him as referenced above, Core personnel have fostered a hostile work environment for Eagen and other employees of Core. Most notably, Core did nothing about numerous complaints from several Core personnel about the conduct of Vens.

43. In the summer of 2024, a security consultant was brought in to assess the Core Specialty headquarters, and while in the conference room across from Vens's office he noticed the

9

baseball bat Vens kept on his table and sometimes carried around the office. Per the security consultant: "a baseball bat not in a display case is considered a weapon."

44.     Cathryn Warner, COO, reported the security consultant's findings to Consolino, stressing "the bat." No action was taken by Consolino and the baseball bat remained viewable in Vens's office until he left the organization.

45.     When Eagen reported Vens's February 2025 conduct to Cathryn Warner, she responded that she was not surprised, that there had been other incidents, and that Vens had exhibited similar conduct toward her.

46.     Discussing Eagen's claims against Vens in June 2025, Cathryn Warner stated to others in Core that a divisional president (Eagen) was filing a complaint because of Vens and that she had told Consolino that others may join. Warner also said to others at Core that Consolino knew about Eagen's complaints about Vens for months and had done nothing about it.

47.     Another officer in Core was also a victim of intimidation and bullying by Vens in 2024. Because of that, she felt fearful, stating to Eagen that Vens knew where she lived and therefore she carried mace with her.

48.     Yet another employee of Core stated in 2024 that she did not like Vens because he scared her.

49.     Still yet another officer in Core experienced intimidating confrontations with Vens shortly before his departure.

50.     Vens was not alone in engaging in inappropriate, harassing conduct toward Core personnel. Consolino also fostered a hostile work environment with regard to Eagen. In January 2025, Consolino asked to try on a blazer Eagen was wearing to see if it fit him, stating Eagen was "so lean."

10

51. In February 2025, Consolino walked up to Eagen in an office, squeezed Eagen's left bicep, and whispered in Eagen's ear that he wished he had dressed better because Eagen "always looks so good," which made Eagen extremely uncomfortable.

52. In April 2022 at the grand opening of Core's Lexington office, Consolino stripped down to his underwear to change clothes in Eagen's office with Eagen in the room.

53. Core exhibited misogyny toward non-male employees. Alison Oliphant was hired to be President of the property line and was told by Consolino she would report directly to him. However, Oliphant was demoted without cause or business justification when she was the only female divisional president within Core, and ultimately left Core because of that discrimination.

54. One employee of Core stated to Eagen in February 2025 that Consolino told her that women in her position should not make much money.

55. Cathryn Warner is the COO of Core, but her oversight of key operational areas has been marginalized or diverted to male Core employees.

56. Other female employees have left Core in the last four years due to sexism and misogyny. The Company also engaged in favorable treatment of males when compared with female employees.

57. For example, Tim H. Delaney, President Commercial Auto, Lancer, Commercial Auto Executive, attempted to resign, but was not allowed to and was thereafter actually given a larger department and greater authority, at the expense of a female executive. Tim H. Delaney, on information and belief, is the nephew of a member of the Core Board of Directors – David P. Delaney, Jr.

58. Core is known to take a sphere of responsibility and reassign it from a qualified woman to a man of less or no qualification with no business justification.

11

59.    Core is also known to ignore or not take seriously complaints about sexual harassment and hostile work environments. That failure to take such complaints seriously had a chilling effect on the making of complaints and discouraged Core employees from exercising and protecting their rights.

## VII.    Core's Treatment Of Eagen After He Filed This Action

60.    After Eagen initiated this action, and while Defendants' Motion to Dismiss was pending, Eagen remained employed by Core but his treatment became less and less tolerable. By way of example, but not limitation:

a.    Core management instituted a policy that all business inquiries for the Equine Division be directed to Vice Presidents of that Division, when prior practice had always been to send business inquiries directly to Eagen, as President of the Division;

b.    Outside brokers reached out to Eagen to wish him well, having been informed by Core that he would be leaving;

c.    Core unilaterally increased Written Premium and Acquisition Expenses in Q4 2025, which had the effect, among many other things, of radically decreasing the Equine Division's earned performance incentives, to the direct detriment of Eagen.

61.    Also during this time, Core continued its plans to issue an IPO. Upon information and belief, Core did not inform its auditors – Ernst & Young – or its Board of Directors of the lawsuit filed by Eagen. Core also did not disclose to the auditors and the Board of Directors its ongoing failure to properly address the hostile and humiliating work environment suffered by Eagen and others, or of the inappropriate behavior of Vens.

12

62.    The actions of the officers, directors, employees, and agents of Core described above were all performed in the course and scope of their employment by or agency for Core, and therefore those actions are imputed to Core for purposes of liability.

## VIII.  Eagen Is Summarily Terminated

63.    Throughout the period of time included in the factual allegations in this matter, the IPO process has been ongoing.

64.    Eagen put Core on notice that he believes Core's failure to disclose this litigation to Core's auditors, to its Board of Directors, and to the SEC, as well as its affirmative efforts to cover up the treatment suffered by Eagen and others and the retaliatory behavior exhibited against Eagen by Mr. Vens, are violations of 17 CFR §240.21F-17 and other SEC regulations, Federal laws, including the Dodd-Frank Act, 12 U.S.C. §5301, et. seq and the Sarbanes-Oxley Act, 15 U.S.C. Chapter 98, and the insurance codes of Delaware, California, Illinois, Indiana, and Kentucky.

65.    Eagen also put Core on notice that he has prepared a Securities and Exchange Commission Tip, Complaint or Referral form (Form TCR) for submission to the SEC.

66.    Core's annual Board Meeting took place on February 24, 2026.

67.    The following day, February 25, 2026, Eagen received a call from a Core officer, Jeff Wanamaker, at 6:30 in the morning, asking if they could meet. Eagen reluctantly agreed, and the two met in the lobby of a Marriott Hotel next door to Core's Lexington office.

68.    At that meeting, Mr. Wanamaker and Eagen spoke and Eagen advised Mr. Wanamaker that the ongoing hostile work environment and the threats Vens had made against Eagen are continuing to cause Eagen severe insomnia and anxiety, for which he is being treated. Mr. Wanamaker nevertheless handed Eagen a letter terminating Eagen's employment, effective immediately.  Mr. Wanamaker stated that he had "hoped the board would stop this."  Mr.

13

Wanamaker asked Eagen to sign the letter under an "Employee Statement" that he had "read and understood the contents of this letter and acknowledge receipt of a copy of this letter." A copy of the termination letter is attached as **Exhibit B**. Eagen refused to sign the letter.

69.     Core timed the termination to occur just four days before Eagen's earned stock ("RSU") grant would have been delivered on March 1, 2026, and just nine days before his earned Equine Bonus for 2025 would have been paid on March 6, 2026. Core thereby wrongfully deprived Eagen of compensation he had earned by terminating him when it did.

## COUNT I

### (Sexual Harassment/Hostile Work Environment In Violation Of KRS 344.030, et seq.)

70.     Plaintiff incorporates by reference all the foregoing allegations of this FAC as if fully set forth herein.

71.     Vens harassed, intimidated, threatened, and otherwise caused Eagen substantial harm in the workplace at Core, related at least substantially to Eagen's status as a homosexual, and thereby created a hostile work environment.

72.     In particular, Eagen reasonably felt harassed, intimidated, threatened, and otherwise substantially harmed by the conduct of Vens, which conduct was known to and tolerated by Core. A reasonable person in the position of Eagen would feel harassed, intimidated, threatened, and otherwise substantially harmed.

73.     The Core workplace was permeated with intimidation, ridicule, and insult that was more than episodic – it was continuous and concerted. The Core workplace intimidation, ridicule, and insult was sufficiently severe and pervasive to alter the conditions of Eagen's and others' employment and created an abusive working environment.

14

74.     The conduct of Vens and others at Core was severe and pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive. Eagen subjectively perceived the environment to be abusive, and the conduct actually altered the conditions of Eagen's employment, all in violation of KRS 344.040, et seq., the Kentucky Civil Rights Act

75.     Eagen is a member of a protected class, was treated differently than others similarly situated but not in his protected class, was subjected to unwanted sexual harassment and intimidation based on his status as gay, and was ultimately subjected materially adverse changes to the conditions of his employment, for which Vens is liable and for which Vens's employers, both the Core entities, are vicariously liable, all pursuant to KRS 344.030, et seq, the Kentucky Civil Rights Act ("KCRA").

76.     As a direct and proximate result of the aforementioned wrongful actions of Core and Vens, Eagen has suffered, and is entitled to recover in this action, compensatory damages in excess of the jurisdictional limits of this Court.

77.     Because the conduct of Core and Vens described above was egregious, malicious, and oppressive, Eagen is further entitled to recover in this action punitive damages in excess of the jurisdictional limits of this Court.

## COUNT II

### (Retaliation
### In Violation Of KRS 344.030, et seq.)

78.     Plaintiff incorporates by reference all the foregoing allegations of this FAC as if fully set forth herein.

79.     Eagen made clear and repeated complaints to Core, Consolino, Larson, and other Core personnel and executives about the wrongful conduct of Vens in accordance with the Core

Anti-Discrimination Policy and the Core Complaint Procedure, but rather than address and remediate that conduct, Core has retaliated against Eagen. Because of Eagen's complaints and because of Eagen's eventual decision to file the Litigation, Core, Consolino, and Larson retaliated by, among other things, asking him to take a leave from his job, undermining his position, power, and authority by holding meetings about Eagen's department outside his presence, undermining his position, power, and authority by directing that Equine Division business be directed to the Division Vice Presidents rather than to Eagen, the Division President, and, ultimately, by terminating his employment. This conduct by Core, Consolino, and Larson, among other things, constitutes a materially adverse employment action that has a clear causal connection between Eagen's complaints about Vens and Eagen's filing the Litigation, on the one hand, and the adverse employment actions taken against Eagen on the other.

80.    As a direct and proximate result of the aforementioned wrongful actions of Core, Consolino, and Larson, Eagen has suffered, and is entitled to recover in this action, compensatory damages in excess of the jurisdictional limits of this Court.

81.    Because the conduct of Core, Consolino, and Larson described above was egregious, malicious, and oppressive, Eagen is further entitled to recover in this action punitive damages in excess of the jurisdictional limits of this Court.

## COUNT III

### (Intentional Infliction Of Emotional Distress)

82.    Plaintiff incorporates by reference all the foregoing allegations of this FAC as if fully set forth herein.

83.    Vens's conduct toward Eagen on February 13, 2025 was intentional or reckless. That conduct was outrageous and intolerable in that it offends against generally accepted standards of decency and morality. Vens's conduct directly and proximately caused Eagen to suffer severe

16

emotional distress. That emotional distress has been and continues to be severe enough to affect Eagen mentally and physically, requiring that he seek therapy and medication as a result.

84. As a direct and proximate result of the aforementioned wrongful actions of Vens, Eagen has suffered, and is entitled to recover in this action, compensatory damages in excess of the jurisdictional limits of this Court.

85. Because the conduct of Vens described above was egregious, malicious, and oppressive, Eagen is further entitled to recover in this action punitive damages in excess of the jurisdictional limits of this Court.

## COUNT IV

### (Discriminatory Termination In Violation Of 42 U.S.C. §2000e, et seq. And 42 U.S.C. §1981a, et seq.)

86. Plaintiff incorporates by reference all the foregoing allegations of this FAC as if fully set forth herein.

87. Defendants singled out Eagen based at least substantially on his sexual orientation by harassing, intimidating, threatening, and otherwise causing Eagen substantial harm in the workplace, and by tolerating that behavior by one or more Core employees. These actions and omissions by Defendants were discriminatory in nature and created a hostile work environment.

88. Defendants Core, Consolino, and Larson terminated Eagen because of his sexual orientation, because he utilized the Core Anti-Discrimination Policy and Complaint Procedure to complain about the treatment he received at the hands of Vens, and because he filed the Litigation and thereby made public the discriminatory behavior and hostile work environment created by Defendants or that was allowed to exist with their knowledge and consent.

89. The actions of Core, Consolino, and Larson in terminating Eagen in retaliation against Eagen for making complaints about the discriminatory behavior and hostile work

17

environment to which he was subjected based at least substantially on his sexual orientation, and in retaliation against Eagen for filing the Litigation, constituted discriminatory behavior in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq. and the Civil Rights Act of 1991, 42 U.S.C. §1981a, et seq.

90.    As a direct and proximate result of the discriminatory and retaliatory actions of Defendants Core, Consolino, and Larson, Eagen has been damaged.

91.    Eagen is therefore entitled to recover compensatory damages from Defendants Core, Consolino, and Larson arising from their discriminatory and retaliatory actions in violation of 42 U.S.C. §2000e, et seq. and 42 U.S.C. §1981a, et seq., the exact amount of which will be determined at trial in an amount in excess of the jurisdictional limits of this Court.

92.    Because the conduct of Core, Consolino, and Larson described above was egregious, malicious, and oppressive, Eagen is further entitled to recover in this action punitive damages in excess of the jurisdictional limits of this Court.

WHEREFORE, Plaintiff Kevin M. Eagen II demands judgment in his favor against Defendants Core Specialty Insurance Holdings, Inc., Core Specialty Insurance Services, Inc., William Vens, Jeff Consolino, and Don Larson as follows:

A.    Judgment on Count I in favor of Plaintiff against Defendants Core and Vens in an amount in excess of the Court's jurisdiction minimums;

B.    An award of punitive damages on Count I in favor of the Plaintiff against Defendants Core and Vens in an amount in excess of the Court's jurisdiction minimums;

C.    Judgment on Count II in favor of Plaintiff against Defendants Core, Consolino, and Larson in an amount in excess of the Court's jurisdiction minimums;

D.    An award of punitive damages on Count II in favor of the Plaintiff against Defendants Core, Consolino, and Larson in an amount in excess of the Court's jurisdiction minimums;

E.    Judgment on Count III in favor of Plaintiff against Defendant Vens in an amount in excess of the Court's jurisdiction minimums;

F.    An award of punitive damages on Count III in favor of the Plaintiff against Defendant Vens in an amount in excess of the Court's jurisdiction minimums;

G.    Judgment on Count IV in favor of Plaintiff against Defendants Core, Consolino, and Larson in an amount in excess of the Court's jurisdiction minimums;

H.    An award of punitive damages on Count IV in favor of the Plaintiff against Defendants Core, Consolino, and Larson in an amount in excess of the Court's jurisdiction minimums;

I.    A trial by jury;

J.    Both pre-judgment and post-judgment interest on all amounts awarded to Plaintiff herein;

K.    Plaintiff's reasonable costs included herein;

L.    Plaintiff's reasonable attorneys' fees; and

M.    Such other and further relief to which Plaintiff may be entitled.

Respectfully submitted,

/s/ Danielle Harlan
RICHARD A. GETTY
and
DANIELLE HARLAN

THE GETTY LAW GROUP, PLLC
The Offices at City Center
100 West Main Street, Suite 200
Lexington, Kentucky 40507

19

Telephone (859) 259-1900
Facsimile (859) 259-1909
rgetty@gettylawgroup.com
dharlan@gettylawgroup.com

COUNSEL FOR PLAINTIFF,
KEVIN M. EAGEN II

## CERTIFICATE OF SERVICE

I certify that on this 27th day of April 2026, a copy of the foregoing Verified First

Amended Complaint was sent electronically through the Court's CM/ECF filing system to all

counsel of record, and was e-mailed to the following:

Mekesha H. Montgomery, Esq.
FBT Gibbons LLP
150 3rd Avenue South, Suite1900
Nashville, Tennessee 37201
mmontgomery@fbtgibbons.com

David E. Schwartz, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West, 395 9th Avenue
New York, New York  10001
dschwartz@skadden.com

Counsel for Defendants

/s/ Danielle Harlan
COUNSEL FOR PLAINTIFF,
KEVIN M. EAGEN II

## **VERIFICATION**

I, Kevin M. Eagen II, swear or affirm that the factual allegations in the foregoing Complaint are true and correct to the best of my knowledge and belief.

_____
KEVIN M. EAGEN II

COMMONWEALTH OF KENTUCKY )

)

COUNTY OF FAYETTE )

Subscribed and sworn to before me by Kevin M. Eagen II on this _15th_ day of April 2026.

My commission expires _11/12/2026_ .

_____
NOTARY PUBLIC
NOTARY ID_____ KYNP 60588_

21